**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

|  | § |  |
|---|---|---|
| VARIANT HOLDINGS LLC, ET AL | § |  |
| *Plaintiff*, | § |  |
|  | § |  |
| v. | § |  |
|  | § | CASE NO. 2:11-CV-290-JRG |
| Z RESORTS LLC, ET AL. | § | CONSOLIDATED |
| *Defendants*. | § |  |
|  | § |  |
|  |  |  |
|  | § |  |
| VARIANT HOLDINGS LLC, ET AL | § |  |
| *Plaintiff*, | § |  |
|  | § |  |
| v. | § |  |
|  | § | CASE NO. 2:11-CV-422-JRG |
| AMERCO, ET AL. | § | CONSOLIDATED |
| *Defendants*. | § |  |
|  | § |  |
|  | § |  |
| VARIANT HOLDINGS LLC, ET AL | § |  |
| *Plaintiff*, | § |  |

§

v.                      §

§     CASE NO. 2:11-CV-427-JRG

HILTON HOTELS HOLDINGS, ET AL.   §     CONSOLIDATED

*Defendants*.            §

§

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the construction of the parties' disputed claim terms. After a full briefing by the parties, a hearing was held on March 26, 2013, before the Court. The Court entered a Provisional Opinion and Order on April 3, 2013 (Dkt. No. 395). This Memorandum Opinion and Order supersedes and subsumes the Provisional Opinion previously entered.

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................... 4

LEGAL PRINCIPLES ................................................................................................... 12

A.     CONSTRUCTION OF AGREED TERMS .......................................................... 16

B.     CONSTRUCTION OF DISPUTED TERMS ...................................................... 16

C.     "EACH OF SAID FIRST OR OTHER COMPUTERIZED CENTRAL
COMMUNICATIONS FACILITIES HAVING" .................................................. 32

D.     "ADDITIONAL INFORMATION RELATING TO SAID GOODS AND SERVICES" 35

E.     "SAID PROCESSOR" ........................................................................................ 38

F.     "THE DATABASE OF THE FIRST OR OTHER CENTRAL COMMUNICATIONS
FACILITY," "SAID DATABASE," and "SAID DATABASE AT SAID FIRST OR
OTHER COMPUTERIZED CENTRAL COMMUNICATIONS FACILITY" ................. 41

G.     "CONTRACT" ..................................................................................................... 45

H.     "MEANS FOR DOWNLOADING SOFTWARE FROM THE CENTRAL
COMMUNICATIONS FACILITY TO THE COMPUTERIZED REMOTE FACILITY"
.............................................................................................................................. 47

CONCLUSION .............................................................................................................. 56

**BACKGROUND**

Plaintiff filed patent infringement lawsuits on June 16, 2011 (against Z Resorts, et al., CV-290), and September 15, 2011 (against Amerco et al., CV-422 and Hilton Hotels et al., CV-427), asserting in all cases United States Patent No 7,624,044, titled "System for Marketing Goods and Services Utilizing Computerized Central and Remote Facilities" ("the '044 Patent"). (CV-290, Dkt. No. 1; CV-427, Dkt. No. 1; CV-427, Dkt. No. 1.) The cases have been consolidated for the proceeding under the case number CV-290.[1]

The Abstract of the '044 Patent states:

A system and means for facilitating transactions between central and remote facilities utilizes electronic communications devices, and computing equipment for concurrently or nonconcurrently transmitting voice, music, audio, data, images, video, optic information, and/or signals. Such systems are used to market, sell, finance, and insure goods and/or services. A study of these systems shows that they fall short because none of them take all types of customer personalities into consideration. A system is needed which provides the customers with more latitude and fewer limitations in shopping for goods and services, or for engaging in business transactions. Such a system and means are provided herein, which meet the needs and desires of independent customers, more dependent customers, and a third, or passive, group of customers. All customer types can at anytime request help from a centrally staffed live attendant.

The Background of the Invention describes various inadequacies in the field of marketing, particularly with respect to marketing of financial services. The patentee states that the field "has been hindered increasingly by such problems as high administrative costs, long delays in creating and implementing services, and complex methods that confound and confuse those at retail sales locations as well as their customers." ('044 Patent, at 1:34 – 37.) With respect to financial service products, the patentee describes the traditional marketing approach as

---

[1] Citations herein using a Dkt. Number refer to the CV-290 case and page numbers refer to the original document pagination.

4

offering services "at retail sales locations by employees of the retail businesses acting as agents for the financial services companies." (*Id*., at 1:41 – 43.) To improve the prior marketing techniques, the patentee proposed that "[a]n ideal system would utilize central and remote locations working together to overcome" the problems of the prior art. (*Id*., at 1:60 – 61.)

However, the patentee also recognized that "[s]uch systems have been tried, but they have not been totally satisfactory." (*Id*., at 1:61 – 62.) In particular, the patent notes the shortcomings of several prior art systems that employ central and remote computing locations working together. The Lockwood reference states "each remote terminal was programmed to elicit information in a predetermined sequence from a customer and to transmit that information to a central processing center." (*Id*., at 1:63 – 67.) The patentee found Lockwood lacking because, "[i]n Lockwood the customer terminal was there for the purpose of satisfying the central processing center, and not for assisting the customer." (*Id*., at 2:13 – 15.)

The patent also discusses the D'Agostino reference as providing "a computerized system which included a personal representative, or financial assistant, at the central terminal . . . [which] was linked to a customer terminal, but the display, and all of the information at the customer terminal, were controlled at the central terminal." (*Id*., at 2:21 – 23.) According to the '044 patent, the D'Agostino reference is lacking as follows:

> The output was controlled by a representative at the central terminal in response to one-on-one conversations between the customer and the representative. The customer had no computer, and D'Agostino did not want him to. The customer was to converse and not use a terminal. Neither Lockwood nor D'Agostino, then, completely solved the problem existing between remote and central facilities.
> (*Id*., at 2:29 – 36.)

The Dworkin reference is also discussed. Dworkin "used a series of screens, tests and templates designed to elicit the desires of a customer." (*Id*., at 2:40 – 42.) After the customer

responded to the prompts (screens, tests etc.) the Dworkin system would determine the customers' desires at the central system and send options back to the customer. The '044 patent further discusses the Walker reference, which "provided a transaction booth located remotely from an operations center." (*Id*., at 2:50 – 51.) Walker's transaction booth was used to rent cars and the '044 patentee criticized Walker stating: "The customer in this instance knew what he wanted. He was not shopping, but merely seeking to effect a predetermined transaction." (*Id*., at 2:56 – 59.)

Finally, the '044 patent summarizes the prior art stating: "[a] review of this prior art shows that all of these systems fall short because none take all types of customer personalities into consideration." (*Id*., at 2:59 – 61.) The specification goes on to discuss the inventor's theory regarding human interaction with computers, "which was partially the basis for the system provided" in the '044 patent. (*Id*., at 2:62 – 64.) The theory proposes that there are three types of customers: an independent customer that requires only an input device to operate in self-service mode (*Id*., at 2:66 –3:4.); a second type of customer that wants to be told what to do, and thereafter, help themselves (*Id*., at 3:5 – 9.); and, a third type of customer that wants to be shown what to do every step of the way. (*Id*., at 3:10 – 14.) This discussion concludes with a second reference to the overall prior art, stating "[t]he invention herein takes all three types of customers, the passive, the dependent, and the independent customers into consideration, and provides a system that any of the three can use. This is not true of the prior art, even when combined." (*Id*., at 3:16 – 20.)

**REMAINDER OF THE DISCLOSURE**

The '044 patent states several objects, although only one "principal object":

The principal object of the system and means of the present invention is to facilitate transactions, especially financing, for customers at remote locations,

including transactions for car, truck, boat and motorcycle dealerships, department stores, public locations such as shopping malls, auction houses, airports, grocery stores, and real estate offices where customers can shop for homes. Especially important transactions are those in computer stores, homes, factories, and office buildings where a consumer or customer wishes to obtain product information or perform a transaction on the site.
(*Id.*, at 3:30 – 36.)

The '044 patent also has a section labeled, "THE INVENTION." (*Id.*, at 4:40 – 7:27.)

This section carries several statements for which the meaning is debated by the parties.

Illustratively, the '044 patent makes the following statements in THE INVENTION section:

The approach of this invention is to permit passive, dependent, and independent customers to shop electronically in the fashion they are accustomed to, that is, as though they were using the yellow or white pages or were shopping in a mall.
(*Id.*, at 4:43 – 46.)

The use of computerized voice is significant. The prior art is limited generally to transmitting only text and perhaps a few graphics, requiring that the customer read a great amount of text to get the information he wanted.
(*Id.*, at 4:55 – 58.)

A disadvantage of text is its limited ability to convey enthusiasm, emotion, and in general meaning.
(*Id.*, at 4:62 – 63.)

Finally, '044 patent's Detailed Description of the Invention is generally disclosed in two components. First there is a discussion of the system hardware as shown in figure 1 (reproduced below). Figure 1 shows the system embodied in two facilities, one central and the other remote. Both facilities have communications equipment suitable for voice (e.g. a phone) and data (e.g. a modem). Both facilities also have a computer. The central facility is also shown to have representatives to speak with and otherwise interact with customers at the remote facilities.



**Fig. 1**

The second part of the Detailed Description discusses use of the facilities to serve all three types of customers (i.e. passive, dependent and independent).

**THE ASSERTED CLAIMS**

Plaintiff asserts Claims 1 – 5, 14 and 16 – 18 of the '044 Patent (disputed terms are in bold):

1. An apparatus to market and/or sell goods and/or services over an electronic network comprising:

a first **computerized central communications facility adapted to be linked** to a **computerized remote facility** and to a plurality of other **computerized central communications facilities, each of said first or other computerized central communications facilities having information relating to goods or services** stored in a database, and **each of said first or other**

**computerized central communications facilities having** a processor programmed to:

receive from a customer located at said **computerized remote facility** a request to at least one of search, browse and access in **said database at said first or other computerized central communications facility** for **information of interest**;

enable said customer to at least one of search, browse and access **said database** for **information of interest**; and

transmit said **information of interest** from **the database at said computerized central communications facility** to said computerized remote communications facility;

wherein at least one of **said computerized central communications facilities** is adapted to provide to said customer at said **computerized remote facility** a list of **computerized central communications facilities** permitting said customer to select and contact at least one other **computerized central communications facility** to request **additional information relating to said goods or services**, and;

wherein at least one of said **computerized central communications facilities** is further programmed to contact the customer and apprise said customer of goods or services offered or any special offerings.

2. An apparatus to market and/or sell goods and/or services over an electronic network comprising:

a first **computerized central communications facility adapted to be linked** to a **computerized remote facility** and to a plurality of other **computerized central communications facilities**, **each of said first or other computerized central communications facilities having information relating to goods or services** stored in a database, and **each of said first or other computerized central communications facilities having** a processor programmed to:

receive from a customer located at said **computerized remote facility** a request

to at least one of search, browse and access in **said database at said first or other computerized central communications facility** for **information of interest**;

enable said customer to at least one of search, browse and access **said database** for **information of interest**; and

transmit said **information of interest** from **the database at said computerized central communications facility** to said computerized remote communications facility;

wherein at least one of said **computerized central communications facilities** is adapted to provide to said customer at said **computerized remote facility** a list of **computerized central communications facilities** permitting said customer to select and contact at least one other **computerized central communications facility** to request **additional information relating to said goods or services**, and;

wherein **said processor** is further programmed to **download software** from said **computerized central communications facility** to said remote communications facility, said **software** adapted to present **information of interest** to said customer.

3. An apparatus to market and/or sell goods and/or services over an electronic network comprising:

a first **computerized central communications facility adapted to be linked** to a **computerized remote facility** and to a plurality of other **computerized central communications facilities**, **each of said first or other computerized central communications facilities having information relating to goods or services** stored in a database, and **each of said first or other computerized central communications facilities having** a processor programmed to:

receive from a customer located at said **computerized remote facility** a request to at least one of search, browse and access in **said database at said first or other computerized central communications facility** for **information of interest**;

enable said customer to at least one of search, browse and access **said database** for **information of interest**; and

transmit said **information of interest** from **the database at said computerized central communications facility** to said computerized remote communications facility;

wherein at least one of said **computerized central communications facilities** is adapted to provide to said customer at said **computerized remote facility** a list of **computerized central communications facilities** permitting said customer to select and contact at least one other **computerized central communications facility** to request **additional information relating to said goods or services**, and;

wherein **said processor** is further programmed to **download software** from said **computerized central communications facility** to said remote communications facility, said **software** adapted to enable said customer to conduct a transaction using the information provided by said **computerized central communications facility** relating to goods or services.

4. An apparatus for marketing at least one of goods or services, comprising:

a first **central communications facility** having a first database of **information relating to goods or services** to provide to a customer at a **computerized remote facility** upon request, said first **central communications facility** adapted to enable said customer to select and contact a second **central communications facility** having a database of information relating to a second set of **information relating to goods or services** to provide upon request; and

a communication device to enable said first **central communications facility** to communicate with said **remote facility** said communication including transmitting said first set of information from said first **central communications facility** to said **remote facility**;

further comprising a **software** application for assisting the **central communications facility** to **download** a **contract** to the computerized remote location.

5. An apparatus for marketing at least one of goods or services, comprising:

a first **central communications facility** having a first database of **information relating to goods or services** to provide to a customer at a **computerized remote facility** upon request, said first **central communications facility** adapted to enable said customer to select and contact a second **central communications facility** having a database of information relating to a second set of **information relating to goods or services** to provide upon request; and

a communication device to enable said first **central communications facility** to communicate with said **remote facility** said communication including transmitting said first set of information from said first **central communications facility** to said **remote facility**;

further comprising **means for downloading software from the central communications facility to the computerized remote facility**.

14. An apparatus to market and/or sell goods or services over an electronic network comprising:

a first **computerized central communications facility adapted to be linked** to a **computerized remote facility** and to a plurality of other **computerized central communications facilities**, **each of said first or other computerized central communications facilities having information relating to goods or services** stored in a database, and **each of said first or other**

**computerized central communications facilities having** a processor programmed to:

receive from a customer located at said **computerized remote facility** a request to at least one of search, browse and access in **said database at said first or other computerized central communications facility** for **information of interest**;

enable said customer to at least one of search, browse and access **said database** for **information of interest**; and

transmit said **information of interest** from **the database at said computerized central communications facility** to said computerized remote communications facility;

wherein at least one of said **computerized central communications facilities** is adapted to provide said customer information regarding rentals.

16. The apparatus of claim 14 wherein at least one of said **computerized central communications facilities** is adapted to enable said customer to print said information.

17. The apparatus of claim 14 wherein at least one of said **computerized central communications facilities** is configured to enable said customer to select and contact another **computerized central communications facility**.

18. The apparatus of claim 14 wherein said rentals are travel rentals.

## LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make

and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as

of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the best guide for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.
> *Phillips*, 415 F.3d at 1316.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the

appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

**CONSTRUCTION OF AGREED TERMS**

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase/Clause | Agreed Definition |
|---|---|
| *"adapted to be linked"* | Plain and ordinary meaning. No construction necessary |
| *"Information of interest"* | Plain and ordinary meaning. No construction necessary |
| *"download"* | Plain and ordinary meaning. No construction necessary |
| *"Software"* | Computer instructions |

(*See* Dkt. No. 378-1.)  In view of the parties' agreements on the proper construction of each of the identified terms, the Court adopts the parties' agreed-upon constructions as set forth above. These agreed-upon constructions govern in this case as to these particular terms.

**CONSTRUCTION OF DISPUTED TERMS**

The parties have presented eight disputed terms for construction.  In line with the parties' briefing, the Court uses capital letters to identify the disputed terms.

**A.     "COMPUTERIZED CENTRAL COMMUNICATIONS FACILITY" and COMPUTERIZED REMOTE FACILITY"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "COMPUTERIZED CENTRAL COMMUNICATIONS FACILITY" | A server or host computer and associated communications device; alternatively, a location with a server or host computer | A central location having computer and communication equipment that enables a person at that location to speak with the customer and to control the equipment at the computerized |

| | | remote facility |
|---|---|---|
| "COMPUTERIZED REMOTE FACILITY" | A customer computer and associated communications device; alternatively, location with a customer computer and associated communications device | A location having computer and communication equipment controllable by a person at a central communications facility with whom the customer can speak |

These terms appear in all of the asserted claims 1 – 5, 14 and 16 – 17 of the '044 Patent. The parties brief these terms together because they share an identical set of issues. The Court also addresses the terms together.

(a)  The Parties' Positions

Plaintiff proposes that the claim term "computerized central communications facility" means "a server or host computer and associated communications device."  Plaintiff also makes an alternative proposal, which is "a location with a server or host computer."  (Dkt. No. 370-1, at 1.)  Defendants propose this term means "a central location having computer and communication equipment that enables a person at that location to speak with the customer and to control the equipment at the computerized remote facility" (*Id.*)

Plaintiff proposes that the claim term "computerized remote facility" means "a customer computer and associated communications device."  Plaintiff also makes an alternative proposal, which is, "location with a customer computer and associated communications device." (*Id.*) Defendants propose that this term means "a location having computer and communication equipment controllable by a person at a central communications facility with whom the customer can speak." (*Id.*)

With respect to these terms, the parties brief five different disputes regarding construction.  The first dispute regards whether the "computerized central communications

facility" ("CCCF") is a computer or a location. Plaintiff argues that because the disputed claim terms are different from the words used in the specification, the claim words do not take on the "location" qualities taught in the specification. Plaintiff reasons that this is because "the claims refer to a 'computerized central communications facility' and a 'computerized remote facility,' (i.e. 'CRF'). According to common sense and Federal Circuit precedent, there is a 'general presumption that different terms have different meanings.' (Dkt. No. 370, at 4.) In addition, Plaintiff notes that the overall claim language refers to the CCCF as a computer because, for example: the CCCF is claimed to "market and/or sell goods and/or services over an electronic network." (Dkt. No. 370, at 4.); or the CCCF is claimed to be "'configured to contact said customer' (Claim 22) and 'configured to provide information.' (Claim 28)." (*Id.*, at 5.) Moreover, Plaintiff argues that the inventor's discussion of prior art references (Lockwood and D'Agastino) uses the word "terminal" for items analogous to the CCCF. (*Id.*) Defendants respond arguing that Plaintiff used the word "location" to describe the same disputed term in a different case regarding a related patent. (Dkt. No. 371, at 16.) Defendants also point out that Plaintiff actually proposes use of the word "location" in its alternative proposal. (*Id.*) In addition, Defendants argue that "the specification repeatedly uses the word 'location' to describe the facilities by referring to the central communications facility as one location, and the remote facility is another." (*Id.*) Plaintiff replies by emphasizing that the words "facility" and "location" are not the same. (Dkt. No. 376, at 6.) Further, Plaintiff notes that Defendant's proposal of a "central location" would create a juror misconception that the claimed facility must be the geographic center. (*Id.*) Finally, Plaintiff agrees that the CCCF and the CRF cannot be at the same location. (*Id.*, at 7.)

The parties' second dispute regards whether the claim word "central" refers to a geographic center or the center of importance. Plaintiff argues that there is no support in the specification for a geographical interpretation of the word "central." (Dkt. No. 370, at 6.) Plaintiff further asserts that Defendants are conflating the meaning of the word "central" by suggesting it relates to geography rather than reading it in the computer science context, where it means importance. Plaintiff also cites dictionaries to support its proposal and offers examples such as the "central" processing unit (the brains of a computer) and "central" nervous system (most important nervous system). (*Id*, at 6 -7.) Finally, Plaintiff argues that none of the '044 patent's lengthy prosecution history or relevant prior art suggests a geographic meaning for the term. (*Id*., at 7 – 8.) Defendants respond by arguing that Plaintiff's proposal ignores the express word "central" in the claims. (Dkt. No. 371, at 13.) Defendants also disagree regarding the teachings of the specification:

> The intrinsic record makes clear that there is equipment and an attendant at a central location and complementary equipment at a different, remote location. See, e.g., Col. 4:9-13 ("Summary of the Invention") (an improvement over the prior art is that equipment is provided at both facilities); Col. 6:59-60 ("The Invention") ("The central facility will have no physical presence at the remote facility.").
> (*Id*., at 13 – 14.)

In the end, however, Defendants admit that "central, though not required to be the geographic center of a computer system, is obviously related to remote in a geographical sense: the computerized central communications facility must be in a location different from the computerized remote facilities; otherwise, the constructions read out the claim terms 'central' and 'remote.'" (*Id*., at 14.) In Reply, Plaintiff agrees that the "central" and "remote" facilities must be in different locations but objects to the construction requiring a "central location" because it might confuse the jury regarding a geographical requirement. (Dkt. No. 376, at 6.)

The third dispute regarding these terms is whether the claims refer to a communications device or communications equipment. Plaintiff argues that, while the difference between a "device" and "equipment" is unclear, "the word 'device' is more appropriate. Specifically, the specification states that, 'the invention is concerned with a system and means for facilitating transactions between central and remote facilities utilizing electronic communications devices, and computing equipment for concurrently or nonconcurrently transmitting voice, music . . ..'" (Dkt. No. 370, at 8.) Plaintiff further contends that "claims 4 and 5 both refer to a 'communication device,' while 'communication equipment' is not found anywhere in the claims or specification." (*Id.*, at 9.) Defendants respond by citing to the specification's repetitive use of the word equipment:

> Referring now to the ***equipment***, it will be appreciated that the overall system means will be the same.
> ('044, at 6:20-21, emphasis added.)
>
> At the remote retail sales facility an area is established where an ***array of electronic communications and computing equipment*** is provided in accordance with the present invention for transmitting and/or receiving information comprising images, video, audio, music, voice, and data about financial services or other goods and services between the central financial services facility and the customer at the remote facility.
> ('044, at 6:24-31, emphasis added.)
>
> In addition, in order that a representative at the central location can communicate with the customer, a complementary ***array of electronic communications and computing equipment*** is located at the central location.
> ('044, at 6:31-34, emphasis added.)

The fourth dispute regards whether the claimed CCCF must control the claimed CRF. Plaintiff argues that the function of "control" is optional and that "Defendants are improperly trying to import a limitation from one particular embodiment into the claims." (Dkt. No. 370, at 9.) Plaintiff continues by asserting that the specification also clearly teaches that a "customer

can serve himself should he wish or if preferred he can sit back and let the representative fully control the presentation." (*Id.*, citing '044, at 12:53-55.) Plaintiff also states that the specification describes a system to serve passive, dependent and independent customers, and that Defendant's proposal only accounts for the passive customers, where control is required. (Dkt. No. 370, at 9.) Further, Plaintiff argues that the specification distinguishes the D'Agostino prior art on this very point. (*Id.*, at 10, citing '044, at 2:26 – 29.) Finally, Plaintiff observes that nothing in the lengthy prosecution history suggests the Defendants' proposed meaning. (Dkt. No. 370, at 10.) Defendants respond by arguing that the intrinsic record requires "control" and a "live attendant":

> The intrinsic record leaves no doubt that the primary stated novelty of the system in the '044 Patent is the flexibility to adapt to any of the three customer types using it. Col. 3:16-20 ("Background of the Invention") ("The invention herein takes all three types of customers, the passive, the dependent, and the independent customers into consideration, and provides a system any of the three can use. This is not true of the prior art, even when combined.") (emphasis added); see also Col. 4:47-48 ("The Invention") ("The system thus adapts to customers rather than requiring customers to adapt to the system."); Abstract; Exh. 2 (Statement Re Prior Art) at 4 (distinguishing the invention over the prior art because the prior art did not provide a system all three customer types can use). Two of the three customer types require the assistance of a live attendant, with the third type requiring an attendant who can take control of the equipment at the remote facility. Col. 3:5-14 ("Background of the Invention").
> The only way the system in the '044 Patent can achieve this stated novelty over the prior art – a system all three customer types can use – is to include equipment that enables the customer to talk to a live attendant at the central facility, and for that attendant to take control over the equipment at the remote facility if needed. These features are not optional.
> (Dkt. No. 371, at 11 – 12.)

Defendants insist that "where a specification repeatedly and consistently describes a limitation as part of the overall invention, rather than just an embodiment, it is a necessary part of the invention" (Dkt. No. 371, at 12.) In this instance, Defendants argue that excluding control and a live attendant will disregard the core features of the claimed invention and ignore columns 1 – 5

of the specification, "which describe the inventive system (not just embodiments, but the invention itself) as requiring a **<u>live attendant</u>** at the central communications facility who can **<u>control</u>** the equipment at the remote facility." (*Id*.) Defendants stress that patentee distinguishes the prior art by the invention's ability to serve all three types of customers (passive, dependent and independent). (*Id*., at 14.) Given that distinction over the prior art, Defendants stress that the system must have "control" and a "live attendant" in order to serve the passive customer. (*Id*., at 14-15.)

Plaintiff replies arguing that Defendants "have not shown a clear disavowal or a contrary definition that would justify limiting the full scope of" the express claim term. (Dkt. No. 376, at 1.) Plaintiff further shows that, in addressing a related patent, the Board of Patent Appeals & Interferences characterized the CCCF as a "server" and without reference to "control" or a "live attendant." (*Id*.) In addition, Plaintiff asserts that the Defendants' specification citations regarding the "invention" are "merely background information about how the inventor came to realize the benefits of a preferred embodiment." (*Id*., at 2.) Plaintiff bolsters this assertion by arguing that nothing in the file history indicates that Applicant overcame the art by defining the CCCF to have "control" or a "live attendant" (Dkt. No. 376, at 5 – 6.) Further, Plaintiff points out that multiple other patents are incorporated into the '044 disclosure and Defendants cite to none of those. (*Id*., at 3.)

The fifth dispute regards whether the claims require that a live attendant is present at the CCCF. The issues and arguments for this dispute are intertwined with the fourth dispute, so the parties' positions are largely covered above. In addition to the positions stated above, Plaintiff argues that the specification offers human speech through multiple embodiments that do not require a live attendant. (Dkt. No. 370, at 11.) Defendants add to their arguments above by citing

the specification to suggest the invention must **allow** voice contact with a live attendant: "Means also establish voice contact between the two communications facilities" ('044, at 4:14-15.); "[m]eans are provided enabling all types of customers at any time they desire personal assistance to establish voice contact to talk to a representative at the central computerized communications facility" (*Id.*, at 4:30-33.); and, "[a]ll customer types can at anytime request help from a centrally staffed live attendant." (*Id.*, at Abstract.) Defendants further argue that a file history document makes the following statements confirming the necessity of voice:

> By the system herein audio, video and data can be transmitted to the customer's facility as the customer and representative speak with each other. The representative can provide the customer with information and the customer can respond verbally to the prompts of the representative at the central facility.
> (Statement Re: Prior Art, Dkt. No. 371-2, at 4.)

Finally, Defendants rebut Plaintiff's argument regarding multiple types of voice disclosed in the patent by arguing that a live attendant is necessary for the passive customer, and the other types of (computerized) voice are for the other types of customers. (Dkt. No. 371, at 16.)

### (b) Analysis

(i) Whether the "computerized central communications facility" ("CCCF") is a computer or a location.

The specification discusses several variants of the claim term "computerized central communications facility": "central facility"; "central computerized communications facility"; and "central computerized facility." In the specification, the "facility" is often expressly juxtaposed to computing and communications equipment residing at the facility. The following examples are illustrative:

> A system and means for facilitating transactions between **central and remote facilities** utilizes electronic communication devices, and computing equipment for concurrently or nonconcurrently transmitting . . . signals.

('044, at Abstract.)

An improvement herein is that computer means are provided at both the ***customer computerized communications facility*** and the ***central computerized communications facility***, adapted to transmit and receive images and data from one to the other.
('044, at 4:9 – 13.)

A database is located at the ***central computerized communications facility*** containing products and services information.
('044, at 4:15– 17.)

Input means are also adapted to enable a dependent type of customer to contact a representative at the ***central computerized facility*** . . ..
('044, at 4:21 – 23.)

Means are provided enabling all types of customers at any time they desire personal assistance to establish voice contact to talk to a representative at the ***central computerized communications facility***.
('044, at 4:30 – 33.)

A speaker phone is also contemplated herein, intended to encompass other comparable devices, such as a video phone or the like, where in addition to 2-way verbal contact the customer can establish 2-way or 1-way visual contact with the representative at the ***central facility***.
('044, at 6:34 – 39.)

The Court finds that the specification references to "central" and "remote" facilities are merely variants of the claim terms; however, none of the references (including the claim terms) are examples of coined terms. The phrases are mere combinations of common words intended to describe something. In this case, the various specification references to "facilities" describe embodiments of the claimed item – a computerized central communications facility or a computerized remote facility. None of the phrase variants observed in the specification are used in a manner that contradicts the distinction between the ordinary meaning of a "facility" and the "equipment" in the facility. When the specification or claims refer to the facility in words that ***might*** apply to a computer, the ordinary interpretation is that those words are referring to the computer or communications resident at the facility. For example, when the claims state that the

CCCF is "configured" to perform a function, those claims are referring to the configuration between and among the various equipment *at* the CCCF. The fact that modern electronics might allow such a configuration to occur in a single machine cannot change the meaning of a "facility" as the patentee used that word in the specification.

The Court finds that the CCCF and the CRF are locations as opposed to computers. The Court cautions the parties that this holding merely adopts the semantic distinction discussed here. This holding does not suggest any limitation with respect to location types or the proximity of locations with respect to each other.

   (ii) Whether the claim word "central" refers to primary importance or a geographic center.

The parties agree that the dichotomy between the claim words "central" and "remote" requires that the two types of claimed facilities (i.e. "remote" and "central") reside at separate locations. However, the parties disagree regarding whether use or reflection of the word "central" is appropriate in the Court's construction. Given the timeframe of the '044 patent (1992 – 1996) and its technical realm (computing and communications), a skilled artisan would reasonably interpret the specification's use of the word "central" in a computer science context. The word ("central") is used throughout the specification without any clear indication that it ever refers to geographic centrality and the Defendants admit the absence of that meaning.

On review of the specification, the Court finds that the word "central" does not refer to geography, but rather refers to the characteristic of the CCCF equipment being a "centralized" resource with respect to remote facilities or users. This conclusion reflects the specifications consistent arrangement placing the customer at remote facility and the service or resource at the central facility:

The principal object of the system and means of the present invention is to facilitate transactions . . . for customers . . .."
('044, at 3:30 – 32.)

Provided herein is a system which enables a customer to obtain knowledgeable assistance from a central facility . . ..
('044, at 3:63 – 645.)

As emphasized the system for marketing products and services herein includes a customer computerized communications facility, a central computerized communications facility remote therefrom, and a data link between them.
('044, at 4:6 – 9.)

Having resolved the parties' dispute, the Court finds that the word "central" requires no construction and appropriately belongs in the construed phrase.

(iii) Whether the claims refer to communications device or communications equipment.

With reference to the specification, the Court finds that the clear teachings of the '044 patent provide for a potential array of computing and communications items at the central and remote facilities. As quoted by Defendants, this meaning is evident throughout the specification:

Referring now to the *equipment*, it will be appreciated that the overall system means will be the same.
('044, at 6:20-21.)

At the remote retail sales facility an area is established where an *array of electronic communications and computing equipment* is provided in accordance with the present invention for transmitting and/or receiving information comprising images, video, audio, music, voice, and data about financial services or other goods and services between the central financial services facility and the customer at the remote facility.
('044, at 6:24-31.)

In addition, in order that a representative at the central location can communicate with the customer, a complementary *array of electronic communications and computing equipment* is located at the central location.
('044, at 6:31-34.)

In addition to the specification's text, the patent's only figure shows both a phone and a modem in each of the remote and central facilities. Plaintiff's proposal of a "device" is contrary to the specification because it connotes the existence of only a single item. Alternatively, the word "equipment" may describe a single item or an array of items, and this is more in tune with the patent's teachings.

(iv) & (v) Whether the claims require that the CCCF have a live attendant and can control the CRF

By proposing that the claimed CCCF have "control" and a "live attendant," Defendants request a construction with a clear variance to the ordinary meaning of the claims' words. Nothing expressly in the disputed claim words implies an aspect of "control" or the existence of a "live attendant." However, Federal Circuit precedent holds that "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance . . . the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips* at 1316. "The standard for disavowal is exacting." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.,* 672 F.3d 1270 (Fed. Cir. 2012), "[T]o disavow claim scope, '[t]he patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (citations omitted).

The Court finds that the Defendants have not met the high standard required to define a claim term outside its ordinary meaning. Defendants cite law supporting the incorporation of limitations that are "repeatedly and consistently" urged in the specification. But, the concepts of "control" and a "live attendant" are not consistently urged by the patentee. As noted above,

"[t]he principal object of the system and means of the present invention is to facilitate transactions, especially financing, for customers at remote locations." ('044, at 3:30 - 32.)  To support their construction, Defendants emphasize the specification's use of the word "invention" when discussing "control" or the use of a live attendant.  For example, the patentee discloses the "approach" of the ***"invention"*** as permitting "passive, dependent, and independent customers to shop electronically in the fashion they are accustomed to, that is, as though they were using the yellow or white pages or were shopping in a mall." ('044, at 4:43 – 46.)  However, whether or not the patentee uses the word "invention," the concept of passive/dependent/independent customers is not disclosed to the exclusion of claiming a system serving only one or two types of those customers.  "Language giving rise to disavowal must amount to 'expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  Even in the most favorable light for Defendants, the '044 specification demonstrates little or no "manifest exclusion" regarding claims directed to a system for serving one or two types of customers.

Defendants also argue that the patentee distinguished prior art due to the invention's ability to serve all three types of customers; and, that "control" and a "live attendant" are necessary to provide the three-prong service.  In this respect, Defendants offer the following quotations (Dkt. No. 371, at 11 – 12):

> The invention herein takes all three types of customers, the passive, the dependent, and the independent customers into consideration, and provides a system any of the three can use. This is not true of the prior art, even when combined."
> ('044, at 3:16-20.)

> The system thus adapts to customers rather than requiring customers to adapt to the system
> ('044, at 4:47-48.)

Presumably, Defendants infer from each quote that the "invention" requires "control" and/or a "live attendant." But, a closer look at the words shows that these statements are all very general with no clear message or implication regarding exclusion of claim scope. A statement that "the invention" takes all types of customers into account does not in any way mean that a specification aspect regarding a single type of customer is not inventive. Another statement that the prior art does not disclose a system that accounts for all three types of customers is not an admission that the prior art does show a system serving only one type of customer. As Plaintiff repetitively argues, the patent was extensively prosecuted without mention by anyone that the express language of the claims somehow implied a requirement of "control" or a "live attendant."

The Court therefore construes "computerized central communications facility" to mean a "location having a centralized computer and communications equipment." The Court also construes "computerized remote facility" to mean a "location having a remote computer and communications equipment."

## B.    "INFORMATION RELATING TO GOODS AND SERVICES"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning; No construction necessary | Information about goods and services that includes voice and video data |

This term appears in Claims 1 through 5 and 14 of the '044 Patent.

(a)  The Parties' Positions

The primary dispute for this term is the same as the prior term so the parties' positions from section A are referenced and only deviations are discussed here. Plaintiff proposes that the term does not require construction." (Dkt. No. 378-1, at 2.) Defendants propose that the term means "information about goods and services that includes voice and video data." (*Id.*)

Plaintiff argues that the disclosed features of the system such as voice and video are options. Plaintiff relies upon on a specification sentence listing "information" items in the disjunctive:

> [T]he specification states that the system carries out activities "by employing an array of computer means for transmitting and/or receiving information comprising images, video, audio, voice, music, and/or data between the financial services facility or location 12 and a customer at one of the respective remote facilities or locations 14. The use of "or" indicates that means for transmitting and/or receiving audio is optional.
> (Dkt. No. 370, at 13.)

Defendants respond by quoting the specification's criticism of text-only systems: "Information in text-only form can 'never succinctly convey a complex thought or idea entirely.' Col. 5:2-3 ("The Invention")." (Dkt. No. 371, at 18.) Defendants further argue that the '044 patentee described prior art as "limited generally to" text and contrasted "the system of the present invention" as understanding and accommodating user preferences for multi-media. (*Id.*) Defendants, moreover, quote the specification extolling the importance of "voice": "For this reason this system's use of computerized voice provides surprising and superior results." ('044, at 5:6-8.) Defendants also cite the file history for its distinction of prior art based upon "human speech."

> As emphasized in his application, applicant is of the belief that a disadvantage of text is its limited ability to convey enthusiasm, emotion, and general meaning. Much is contained in human speech in terms of inflection, tone, and volume, which convey a significant part of the idea intended. … Transmissions of such audio, video and data in marketing, selling, financing, and insuring goods and/or services are not suggested by the prior art.
> (Nov. 2000 Appeal Brief, Dkt. No. 371-5, at 16.)

Finally, Defendants argue that the clear meaning of the specification is not rebutted by Plaintiff's evidence regarding the disjunctive list of "information" types ("and/or data") in the specification. (Dkt. No. 371, at 20.)

Plaintiff replies by stating that "Defendants' recitation of the prosecution history is grossly mistaken and incomplete" because the pending claims at the time of the quoted brief contained limitations expressly relevant to voice and video. (Dkt. No. 376, at 7 – 8.)

(b)  Analysis

Like the prior term, Defendants' proposal to add "voice" and "video" to the construction is clearly outside of the ordinary meaning of the claims' words.  However, as discussed above, Federal Circuit precedent allows this type of claim construction where "an intentional disclaimer, or disavowal, of claim scope by the inventor [dictates] the inventor's intention." *Phillips at* 1316. The standard for disavowal is exacting and requires a manifest exclusion or restriction in the specification.  *See Digital-Vending Servs. at* 1270, and *Aventis Pharma S.A. at* 1330. Defendants have not met this high standard.

Similar to the discussion above, the notions of "video" and "voice" are not consistent in the specification.  The specification's use of the disjunctive when listing types of information is very persuasive, stating that the system facilitates its activities "by employing an array of computer means for transmitting and/or receiving information comprising images, video, audio, voice, music, ***and/or*** data between the financial services facility or location 12 and a customer at one of the respective remote facilities or locations 14." ('044, at 8:63 – 66.)

Defendants' citations to the intrinsic record are insufficient to counter the specification's express statement regarding alternative types of information.  Furthermore, the patentee's criticism of text systems is similarly unavailing at least because a criticism of text does not necessitate the use of voice and video.  As Plaintiff argues, "[i]n general, statements about the difficulties and failures in the prior art, without more, do not act to disclaim claim scope." *Retractable Techs. v. Becton, Dickinson*, 653 F.3d 1296, 1306 (Fed. Cir. 2011).  Moreover,

"[m]ere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner v. Sony Computer Entertainment Am.*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).

Defendants also quote file history citations such as the reference to the Applicant's 2000 Appeal brief. However, this citation is misguided because the claims pending at that time expressly included voice and video. The remainder of Defendants citations are all either too general or simply inapplicable, so none provide the exclusion or restriction that the law requires to construe the claims as requested. For example, the patentee's statement that "the use of computerized voice is significant" in no way excludes claims that do not require computerized voice. "Language giving rise to disavowal must amount to 'expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Teleflex at* 1325. Even in the most favorable light for Defendants, the '044 specification demonstrates little or no "manifest exclusion" regarding claims directed to a systems that do not require video and voice.

The Court finds that no construction is necessary. Therefore, the term "information relating to goods and services" should be given its plain and ordinary meaning.

## C. "EACH OF SAID FIRST OR OTHER COMPUTERIZED CENTRAL COMMUNICATIONS FACILITIES HAVING"

| *Plaintiff's Proposed Construction* | *Defendants' Proposed Construction* |
|---|---|
| Plain and ordinary meaning; no construction necessary.<br>Alternatively, each of the first and the other computerized central communications facilities having | All of the first and other central Communications facilities each have |

This phrase appears in Claims 1 – 3 and 14 of the '044 Patent.

(a) The Parties' Positions

Plaintiff proposes that this term requires no construction or in the alternative, should be construed to mean "each of the first and other computerized central communications facilities having." (Dkt. No. 378-1, at 2 - 3.) Defendants propose that this term means "all of the first and other central communications facilities each have." (*Id.*)

Plaintiff argues that the meaning of this term is apparent on the face of the claim. (Dkt. No. 370, at 14.) Plaintiff also offers that, if the "jury might get confused about whether 'each of X or Y' means 'each of X or Y,' or 'each of X and Y,' the parties have agreed that 'and' is appropriate." (*Id*., at 15) Defendants respond that "[t]he problem with Plaintiff's construction is that it leaves open the possibility that something less than 'all' of the recited central communications facilities could have the claimed structures and capabilities." (Dkt. No. 371, at 21.) Plaintiff replies that while the claims require a first and a plurality of other CCCFs, the subject term requires only a first and one other CCCF. (Dkt. No. 376, at 8.)

(b) <u>Analysis</u>

The parties raise a dispute regarding whether all or only two CCCF's must have "information relating to goods or services stored in a database." The disputed claim phrase employs a common patent claiming technique using the word "said" to refer to an antecedent limitation introduced earlier in the claim. The Court finds that claim words are most instructive to resolve the dispute because the parties principally disagree regarding the application of the antecedent words. The relevant portion of exemplary claim 1 is recited below with the disputed claim term in underline, and the antecedent claim phrases in bold italics.

> 1. An apparatus to market and/or sell goods and/or services over an electronic network comprising:
> *a first computerized central communications facility* adapted to be linked to a computerized remote facility and to *a plurality of other computerized central communications facilities*, <u>each of said first or other computerized central communications facilities</u> having information relating to goods or services stored

in a database, and each of said first or other computerized central communications facilities having a processor programmed to: . . .

The disputed phrase states "each of **said** first or other computerized central communications facilities."  This is a very clear reference to antecedent claim phrases as highlighted in the quoted claim above.  The word "first" in the disputed phrase refers to the antecedent "a **first** computerized central communications facility."  Also, the word "other" in the disputed phrases refers to the antecedent "a plurality of **other** computerized central communications facilities."  Thus, the disputed portion of the claim could be re-written as follows without changing the meaning: "**each** of said (1) first computerized central communications facility, or (2) plurality of other computerized central communications facilities, having."

The Court agrees with the parties that the claim word "each" applies to both items (1) and (2).  Indeed, common grammar reveals that the disputed claim phrase refers to all of the claimed CCCFs (i.e. a minimum of three -- the first CCCF and the plurality of other CCCFs).  Thus, the Court finds that the plain and ordinary meaning of the disputed phrase requires that all of the **claimed** CCCFs must have "information relating to goods and services . . ." etc.  This is a result of the clear claim syntax and a jury will most easily follow this meaning without any alteration of the claim words.  In addition, this meaning is reflected in the specification, which teaches that "information relating to goods and services" is located at a central facility. ('044, at 4:15-16 ("A database is located at the central computerized communications facility containing products and services information.")) However, the Court's use of the word "all" does not indicate that an accused system must incorporate all of any particular Defendant's servers or facilities.  This Order merely requires that all accused CCCFs must meet the claim requirements (e.g. having information relating to goods and services) flowing from the normal reading of the claim.

The Court finds that no construction is necessary. Therefore, the term "each of said first or other computerized central communications facilities having" should be given its plain and ordinary meaning.

## D. "ADDITIONAL INFORMATION RELATING TO SAID GOODS AND SERVICES"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning; no construction necessary.<br>Alternatively, information relating to goods or services in the database of a computerized central communications facility on the list of computerized central communications facilities. | Further information about the same goods and services about which there is information available from the central communications facility that provided the list |

This term appears in Claims 1- 3 of the '044 Patent.

(a)  The Parties' Positions

Plaintiff proposes that this term requires no construction, or in the alternative, should be construed to mean "information relating to goods or services in the database of a computerized central communications facility on the list of computerized central communications facilities." (Dkt. No. 378-1, at 2.)  Defendant proposes the term means "further information about the same goods and services about which there is information available from the central communications facility that provided the list." (*Id.*)

Plaintiff first argues that an ordinary reading of the claim supports its proposal. (Dkt. No. 370, at 6.)  Plaintiff also criticizes Defendants' proposal noting that it is contrary to the specification and nonsensical that another vendor would have information in its database about the first vendor's products. (*Id.*)  Plaintiff also asserts that the specification makes clear that the "other" CCCF's provide access to a "myriad of goods and services." (*Id.*, quoting '044, at 7:34-42.)  And further, Plaintiff notes that the specification refers to completely different types of

vendors: real estate, computer stores, groceries etc. (*Id.*, at 17.) Defendant responds asserting that the claim language is dispositive as it recites, "***said*** goods and services." (Dkt. No. 371, at 22.) Defendants further argue that nothing in the intrinsic record alters the clear meaning of the claims on this issue. (*Id.*, at 22.) Finally, Defendant rebuts the specification's disclosure of "a myriad" of products by noting that the invention's "principal object" related to "especially financing" – only one type of good/service. (*Id.*)

<u>(b) Analysis</u>

The parties disagree regarding whether the claims' use of "said goods and services" refers to a particular set of goods and services or ***any*** goods and services. Both parties agree that the claim language controls this construction and each observes that the antecedent of the disputed phrase is relevant. The Court agrees that the claim language is controlling to determine the antecedent of the disputed phrase and then, the meaning of that antecedent. The relevant portion of illustrative claim 1 is reproduced here for reference with the disputed phrase underlined and the antecedent shown in bold italics.

> 1. An apparatus to market and/or sell goods and/or services over an electronic network comprising:
>
> a first computerized central communications facility adapted to be linked to a computerized remote facility and to a plurality of other computerized central communications facilities, each of said first or other computerized central communications facilities having information relating to ***goods or services*** stored in a database, and each of said first or other computerized central communications facilities having a processor programmed to:
>
> receive from a customer located at said computerized remote facility a request to at least one of search, browse and access in said database at said first or other computerized central communications facility for information of interest;
>
> enable said customer to at least one of search, browse and access said database for information of interest; and

transmit said information of interest from the database at said computerized central communications facility to said computerized remote communications facility;

wherein at least one of said computerized central communications facilities is adapted to provide to said customer at said computerized remote facility a list of computerized central communications facilities permitting said customer to select and contact at least one other computerized central communications facility to request <u>additional information relating to said goods or services</u>, and;

wherein at least one of said computerized central communications facilities is further programmed to contact the customer and apprise said customer of goods or services offered or any special offerings.

The disputed claim phrase, "additional information relating to said good and services," relates back to the "goods and services" claimed in the first paragraph of the claim. To determine the nature of those goods and services, the Court looks at the overall claim and finds that the following claim portion is particularly relevant.

each of said first or other computerized central communications facilities having ***information relating to goods or services*** stored in a database

The claim language very clearly shows that the antecedent "information relating to goods or services" from the claim's first paragraph is the "information" from "each of said first or other computerized central communications facilities." A question then arises regarding whether that "information" includes limited or all information. But the Court has already decided (per Defendants' general proposal) that "each of said first or other computerized central communications facilities" refers to ***all*** the claimed CCCFs. In view of that construction, the relevant phrase above refers to the aggregate of "information relating to goods and services" owing to all the claimed CCCFs. Therefore, the later claim use of "additional information relating to said goods and services" may relate to any of the aggregated antecedent goods and services.

This result simply flows from the claim language, and is equally supported in the specification. As Plaintiff suggests, the specification refers to a "myriad" of products and services ('044, at 7:34 – 42) and analogizes a desirable customer experience to "using the yellow or white pages" and "shopping in a mall." ('044, at 4:42 – 46.) The claim term is not limited as Defendants propose.

The Court finds that no construction is necessary. Therefore, the term "additional information relating to said goods or services" should be given its plain and ordinary meaning.

## E. "SAID PROCESSOR"

| *Plaintiff's Proposed Construction* | *Defendants' Proposed Construction* |
|---|---|
| Plain and ordinary meaning; no construction necessary.<br><br>Alternatively, the processor associated with the first computerized central communications facility and the processor associated with the other computerized central communications facility | "Said processor" as used in claims 2 and 3 refers to each "processor" in claim elements 2(a) and 3(a) |

This term appears in Claims 2 and 3 of the '044 Patent.

(a) The Parties' Positions

Plaintiff proposes that this term requires no construction, or in the alternative, should be construed to mean "the processor associated with the first computerized central communications facility and the processor associated with the other computerized central communications facility." (Dkt. No. 378-1, at 6.) Defendant proposes the term means "'Said processor' as used in claims 2 and 3 refers to each 'processor' in claim elements 2(a) and 3(a)." (*Id.*)

Plaintiff suggests that the issues for this term are the same as the prior term. (Dkt. No. 370, at 18.) Plaintiff believes that the parties agree that "said processor" refers to each CCCF, but Plaintiff nevertheless opposes Defendants' proposal as confusing. (*Id.*) Defendant argues

that the "claim language makes this clear by referring to a first and a plurality of others (i.e., at least two more, so three total). Defendants seek a construction to clarify which of these at least three recited processors is being referred to by the applicant's confusing use of 'said processor' in those claims." (Dkt. No. 371, at 23 – 24.) Finally, Defendants argue that their proposal is consistent with the intrinsic evidence and that Plaintiff's proposal is confusing by use of the "associated with" language. (*Id*., at 23.)

(b) Analysis

The parties dispute what the claims refer to when using the phrase "said processor." Similar to prior terms discussed above, the Court finds that the claim language is controlling to determine the antecedent of the disputed phrase and then, the meaning of that antecedent. The relevant portion of illustrative claim 2 is reproduced here for reference with the disputed phrase underlined and the antecedent shown in bold italics.

2. An apparatus to market and/or sell goods and/or services over an electronic network comprising:

a first computerized central communications facility adapted to be linked to a computerized remote facility and to a plurality of other computerized central communications facilities, each of said first or other computerized central communications facilities having information relating to goods or services stored in a database, and each of said first or other computerized central communications facilities having *a processor* programmed to:

receive from a customer located at said computerized remote facility a request

to at least one of search, browse and access in said database at said first or other computerized central communications facility for information of interest;

enable said customer to at least one of search, browse and access said database for information of interest; and

transmit said information of interest from the database at said computerized central communications facility to said computerized remote communications facility;

wherein at least one of said computerized central communications facilities is adapted to provide to said customer at said computerized remote facility a list of computerized central communications facilities permitting said customer to select and contact at least one other computerized central communications facility to request additional information relating to said goods or services, and;

wherein <u>said processor</u> is further programmed to download software from said computerized central communications facility to said remote communications facility, said software adapted to present information of interest to said customer.

The claim phrase "said processor" relates back to the "a processor" claimed in the first paragraph of the claim. To settle the parties' dispute, the Court looks at the overall claim and finds that the following claim portion is particularly relevant.

a first computerized central communications facility adapted to be linked to a computerized remote facility and to a plurality of other computerized central communications facilities, . . . each of said first or other computerized central communications facilities having ***a processor*** programmed to

The claim language very clearly shows that the antecedent "a processor" from the claim's first paragraph is "a processor" from "each of said first or other computerized central communications" facilities." The Court has already decided (per Defendants' general proposal) that "each of said first or other computerized central communications facilities" refers to ***all*** the claimed CCCFs. In view of that construction, the phrase "a processor" indicates the processor for each of the claimed CCCFs. Thus, when referenced later in the claim by "said processor," the term refers to any one or all of the CCCFs' processors, depending upon the context of the later reference.

In the case of the term disputed here, the claim phrase "said processor" refers to one processor in each of all the claimed CCCFs. The claim states, "wherein said processor is further programmed to download software . . ." This use of "said processor" clearly refers back to "a processor" for each of all the claimed CCCFs. This syntactical reading is consistent with the

specification, which teaches that software is located at each central facility and that the central facilities can download software to a remote communications facility.

> In general substantially ***all application software will be located at each central facility,*** and programs there will prompt the customer for input, choices, or preferences so that the customer will contact the central facility and then indicate those choices or preferences. ***Certain software at the central facility can be downloaded to the remote location*** to provide proper control and support for the customer.

> ('044, at 6:60 – 66.)

The Court finds that no construction is necessary. Therefore, the term "said processor" should be given its plain and ordinary meaning.

**F.    "THE DATABASE OF THE FIRST OR OTHER CENTRAL COMMUNICATIONS FACILITY," "SAID DATABASE," and "SAID DATABASE AT SAID FIRST OR OTHER COMPUTERIZED CENTRAL COMMUNICATIONS FACILITY"**

| *Term* | *Plaintiff's Proposed Construction* | *Defendants' Proposed Construction* |
|---|---|---|
| The database at said computerized central communications facility | **Plt:** Plain and ordinary meaning; no construction necessary. Alternatively, the database of the first or other central communications facility | **Defs:** Indefinite |
| Said database | **Plt:** Plain and ordinary meaning; no construction necessary. Alternatively, the database of the first or other central communications facility | **Defs:** Indefinite |
| Said database at said first or other computerized central communications facility | **Plt:** Plain and ordinary meaning; no construction necessary. Alternatively, the database of the first or other central communications facility | **Defs:** Indefinite |

These terms appears in Claims 1 through 3 and 14 '044 Patent.

(a)  The Parties' Positions

The parties brief these three related terms together. For the first term, "the database at said computerized central communications facility," Plaintiff proposes that no construction is necessary, or in the alternative requests the term be construed to mean, "the database of the first or other central communications facility." (Dkt. No. 378-1, at 2 – 3.) For the second term, "said database," Plaintiff also proposes that no construction is necessary, or in the alternative requests the term be construed to mean "the database of the first or other central communications facility."(*Id*.) For the third term, "said database at said first or other computerized central communications facility," Plaintiff again proposes that no construction is necessary, or in the alternative requests the term be construed to mean "the database of the first or other central communications facility." (*Id*.) Defendants propose that all three terms are indefinite. (*Id*.)

Plaintiff argues that Defendants read the claims "with blinders" on and summarize the validity of the claims as follows:

> When read with any reasonableness, the structure of the claims makes their meaning clear. First, each of (i.e., both of) the first and other CCCFs have information about their goods and services stored in their databases. Second, each (i.e., both of) the CCCFs has a processor programmed to receive a request to at least one of search, browse and access its database. This is logically and grammatically correct. Further, as noted in Section II.D above, it is nonsensical, contrary to the claim language, contrary to the specification, and contrary to the prosecution history for Defendants to argue the claims require a vendor to have in its database information about the products or services of another vendor.
> (Dkt. No. 370, at 20.)

Plaintiff also points out that the dispute surrounding these terms is similar to the prior terms regarding the meaning of antecedents; and Plaintiff questions why Defendants find this particular term indefinite. (*Id*.) Finally, Plaintiff observes that over the very lengthy prosecution of the '044 patent, there was never a suggestion that these phrases were indefinite. (*Id*., at 21.)

Defendants primarily argue that it is impossible to determine which of the claimed processors and claimed functions are referring to which claimed databases:

> Plaintiffs argue it is clear which of at least three "database(s)" is being referred to in these claims. Plaintiffs' Brief at 20. But the required "searching," "browsing," and "accessing" functions that these at least three processors must all be "programmed to enable" do not refer to "its database," "their databases," or use any sort of understandable identification of, or correlation to, any of the at least three claimed "databases."
> (Dkt. No. 371, at 25.)

Finally, Defendants argue that other '044 patent claims specify "first" or "second" databases thereby demonstrating the ambiguity in the disputed claim. (*Id*., at 25 – 26.)

(a)  Analysis

The parties disagree regarding whether the claims' use of "said database" or "the database" is sufficiently definite to allow the public to understand to which database the claim refers. The Court finds that the claim language is controlling.  Illustrative claim 1 is reproduced here for reference with the disputed phrases underlined and the antecedent shown in bold italics.

> 1. An apparatus to market and/or sell goods and/or services over an electronic network comprising:
> a first computerized central communications facility adapted to be linked to a computerized remote facility and to a plurality of other computerized central communications facilities, each of said first or other computerized central communications facilities having information relating to goods or services stored in ***a database***, and each of said first or other computerized central communications facilities having a processor programmed to:
> receive from a customer located at said computerized remote facility a request to at least one of search, browse and access in <u>said database at said first or other computerized central communications facility</u> for information of interest;
> enable said customer to at least one of search, browse and access <u>said database</u> for information of interest; and
> transmit said information of interest from <u>the database at said computerized central communications facility</u> to said computerized remote communications facility;
> wherein at least one of said computerized central communications facilities is adapted to provide to said customer at said computerized remote facility a list of computerized central communications facilities permitting said customer to select and contact at least one other computerized central communications facility to request additional information relating to said goods or services, and;

wherein at least one of said computerized central communications facilities is further programmed to contact the customer and apprise said customer of goods or services offered or any special offerings.

The first claim paragraph recites the antecedent term, "a database." The claim is clear that each and every claimed CCCF has a ***respective*** database[2]: "each of said first or other computerized central communications facilities having information relating to goods or services stored in ***a database . . . .***" The claim goes on to recite a processor for each CCCF and require that the processor be programmed to perform three functions: the "receive" function; the "enable" function; and, the "transmit" function. Each function is associated with one of the disputed database terms. The Court separately analyzes each relevant claim phrase to determine if a meaning is reasonably decipherable.

The claimed "receive" function states:

receive from a customer located at said computerized remote facility ***a request*** to at least one of search, browse and access in <u>said database at said first or other computerized central communications facility</u> for information of interest

Recalling that the first claim paragraph establishes that each CCCF has a respective database, the "receive" function clearly requires "at least one of search, browse and access" to the database that is respective to the CCCF that received the claimed request. The Court finds this construction apparent from the claim words and consistent with the specification. In the absence of a compelling alternative interpretation, the Court finds this term definite because it is easily understood and not insolubly ambiguous.

The claimed "enable" function states:

enable said customer to at least one of search, browse and access <u>said database</u> for information of interest

---

[2] To be very clear, the Court is not holding here that the respective databases must be mutually exclusive or independent of one another.

The claim recites only one "customer," which is introduced in the claim clause reciting the "receive" function. Thus, "said database" in the "enable" function clause refers to the same database referenced in the "receive" clause. As discussed above, this is the database respective to the CCCF that received the claimed request. The Court finds this construction readily apparent from the claim words and consistent with the specification. In the absence of a compelling alternative interpretation, the Court finds this term definite because it is easily understood and not insolubly ambiguous.

The transmit function states:

transmit said information of interest from <u>the database at said computerized central communications facility</u> to said computerized remote communications facility

The claim recites only one "information of interest" as recited in the "receive" and "enable" clauses. Therefore, the recited "database at said computerized central communications facility" must again be the database respective to the CCCF that received the claimed request. As above, the Court finds this construction readily apparent from the claim words and consistent with the specification. In the absence of a compelling alternative interpretation, the Court finds this term definite because it is easily understood and not insolubly ambiguous.

The Court holds that the disputed claim terms are not indefinite and that no further construction is necessary.

## G.    "CONTRACT"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. Alternatively, a binding agreement that can be assented to | An agreement that legally obligates the customer |

This term appears in Claim 4 of the '044 Patent.

<u>(a) The Parties' Positions</u>

Plaintiff proposes that this term requires no construction, but in the alternative requests that the term be construed as "a binding agreement that can be assented to." (Dkt. No. 378-1, at 9-10.) Defendants propose this term be construed as "An agreement that legally obligates the customer." (*Id*.)

Plaintiff's argue that this term has a plain and ordinary meaning that "is easily understandable by a jury." (Dkt. No. 370, at 22.) Further, Plaintiff cites at length from the specification to demonstrate that, within the context of the specification, "a 'contract' is a 'contract' before it is signed and becomes legally binding" (*Id*., at 23):

> "[o]nce the contracts are printed out the customer is directed to sign them" and "he can take possession of any purchased goods or merchandise in contemplation of the financial services companies accepting the applications and performing final execution of the contracts in the home sovereign." 044/11:28-36. "Alternatively, some other means of remitting payment and any completed contracts to the agent can be used such as electronically where the customer can for example endorse an electronic signature box displayed on his monitor by means of an electronic pen or other comparable device and subsequently transmit by modem the electronic contracts back to the central facility or by some other electronic means to permit the customer to legally apply for contracts perhaps comprising the faxing or transmitting of a signed contract from the remote to the central facility." 044/11:40-59.
> (*Id*.)

Defendants argue that the specification defines both "contracts" and "offers" and distinguishes these two items. (Dkt. No. 371, at 26.) Defendants also cite the prosecution history as supporting this position:

> "Consistent with this distinction, during prosecution, the applicant argued that prior art did not anticipate the downloading of a "contract" as claimed when it required the customer to assent to the terms of a proposed agreement (e.g., by submitting an order form for goods or services, "by ordinary mail, electronic mail, or facsimile"). See Exh. 8 (July 2004 Suppl. Amendment) at 15.
> (*Id*.)

Finally, Defendants cite to various dictionaries and criticize Plaintiff's proposal as overly broad because it eliminates the distinction between contracts and offers. (*Id.*, at 27.)

(b) Analysis

The specification, as cited by Plaintiff, shows that the '044 patent uses the word "contract" to refer to agreements that are not yet executed. The use of the word extends even further to include items such as "applications":

> Once the ***contracts*** are printed out the customer is directed to sign them and personally place them and any required payment (check) in a mail bag 28 located at the retail sales facility 14. A binder can be issued upon the customer signing ***applications*** for financial services and mailing them so he can take possession of any purchased goods or merchandise in contemplation of the financial services companies accepting the applications and performing final execution of the contracts in the home sovereign.
> ('044, at 11:28 – 36.)

In view of the clear contextual meaning provided by the specification, the Court rejects contradicting extrinsic evidence. Further, upon inspection, Defendants' citation to the file history is misplaced. As shown below, the Applicant merely demonstrated that the Dworkin reference did not ***download*** contracts. The passage has no bearing on the disputed issue.

> With respect to Claim 54, Dworkin does not disclose, teach or suggest 'a software application for assisting the central communications facility to download a contract to the computerized remote location'. Fig 1 and the specification at Col. 4, lines 17-24 only disclose the computer (1) can be connected electronically to the vendors so that orders can be placed by ordinary mail, electronic mail, or facsimile. Therefore, Claim 54 is allowable as are all other claims which are dependent on independent Claim 44.
> (Dkt. No. 371 – 8 (July 2004 Suppl. Amendment), at 15.)

The Court construes the term "contract" to mean "an agreement that becomes binding upon assent of all the parties thereto."

H.   **"MEANS FOR DOWNLOADING SOFTWARE FROM THE CENTRAL COMMUNICATIONS FACILITY TO THE COMPUTERIZED REMOTE FACILITY"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **Function:** Downloading software from the central communications facility to the computerized remote facility (AGREED) | **Function**: Downloading software from the central communications facility to the computerized remote facility (AGREED) |
| **Structure:** A modem or communications link, or any equivalents thereof. | **Structure:** At least one device with a computer processor utilizing a computer program is required to perform the claimed function. The applicant failed to disclose an algorithm for performing the claimed function, and therefore the term is indefinite. |

This term appears in Claims 5 of '044 Patent.

(a)  The Parties' Positions

For a claim written in means plus function format, the Court must construe both the function and structure.   Here, the parties agree that the claimed function is "downloading software from the central communications facility to the computerized remote facility." (Dkt. No. 378-1, at 10 – 11.)   Plaintiff proposes that the claimed structure is "a modem or communications link, or any equivalents thereof."   Defendants propose that the claimed structure is "at least one device with a computer processor utilizing a computer program," but Defendants argue there is no algorithm to support the computer program, leaving the clam invalid. (*Id.*)

Plaintiff argues that figure 1 is illustrative because it shows that the CCCF has modem 30 for communicating and that link 42 joins the CCCF and the remote facility.   (Dkt. No. 370, at 24.)   Plaintiff further asserts that the specification describes the role of these items in communicating: "Communications link 42 facilitates data communications between computer 32 of central communications facility 12, via modem 30, and computer 18 at remote communications facility 14, via modem 16." 044/8:16-29." (*Id.*)   Plaintiff also argues that the claim does not call for a computer to download the software. (*Id.*, at 25.)

Defendants argue that the '044 patent "discloses general purposes computers 32 and 18, which are used to perform the downloading function, and which must utilize a computer program to perform the claimed 'downloading software' function." (Dkt. No. 371, at 28.)   Defendants bolster this evidence by extensively citing to the claims and specification:

> wherein said processor is further programmed to download software from said computerized central communications facility to said remote communications facility."
> (*Id.*, at 29, quoting claims 2 and 3.)

> further comprising a software application for assisting the central communications facility to download a contract to the computerized remote location.
> (*Id.*, at 29, quoting claim 4.)

> The material … can also include a list of suggested product or services downloaded from the central facility computer.
> (*Id.*, at 29, quoting '044, at 10:47-51.)

Finally, Defendants cite to the file history where the patentee allegedly expressly linked the downloading function to software:

> In particular, the Office Action alleges that 'the specification fails to disclose how software is downloaded [] from the central communications facility to the computerized remote facility.' . . . This is disclosed throughout the specification, for example, at page 9, lines 13-18, it is disclosed: Input means located at the customer computerized communications facility and application software located at the central computerized communications facility enable either type of customer to download from the central computerized communications facility to the customer computerized communications facility information, for instance, prices and contracts, desired by the customer. Accordingly, Applicant submits that the specification adequately supports the claims. As to the Examiner's inquiry about how the software is downloaded, Applicant respectfully submits that at the time of the invention an ordinary skilled artisan would have known several ways to accomplish downloading software.
> (*Id.*, at 29, quoting Dkt. No. 371-11 (Applicant's Response faxed Nov. 2001), at 17-18.)

(b)  Analysis

In construing a means-plus-function limitation, a Court must first identify the claimed function. *Budde v. Harley-Davidson, Inc.,* 250 F.3d 1369, 1376, (Fed. Cir. 2001).  The next step

is to identify the structure set forth in the written description that performs the particular function recited by the claim. The law does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257-58, (Fed. Cir. 1999).) "Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424,(Fed. Cir. 1997).

Here, the parties have agreed that the appropriate claimed function is "downloading software from the central communications facility to the computerized remote facility." (Dkt. No. 378-1, at 10 – 11.) The Plaintiff has proposed that the corresponding structure is merely hardware shown in figure 1: namely, the modem (30) and the link (42). The Defendants propose that only software for a general- purpose computer is clearly linked to the function. In making this argument, Defendants rely on well settled law that simply disclosing software without providing some detail about the means to accomplish a function is not enough. *Noah Sys., Inc. v. Intuit, Inc.,* 675 F.3d 1302, 1312 (Fed. Cir. 2012). In cases where software is the structure supporting a means limitation, the Federal Circuit requires the specification to disclose the algorithm for performing the function. *Function Media, L.L.C. v. Google Inc.,* 2013 U.S. App. LEXIS 3033, 12-13 (Fed. Cir. Feb. 13, 2013). The specification can express the algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure. *Id.*

The Court looks to the intrinsic record to determine the structures (if any) that are clearly linked to the function. *B. Braun Med., Inc. at* 1424. Foremost, the Court looks to claim 5, which is the only claim at issue for this term:

5. An apparatus for marketing at least one of goods or services, comprising:

a first central communications facility having a first database of information relating to goods or services to provide to a customer at a computerized remote facility upon request, said first central communications facility adapted to enable said customer to select and contact a second central communications facility having a database of information relating to a second set of information relating to goods or services to provide upon request; and
a communication device to enable said first central communications facility to communicate with said remote facility said communication including transmitting said first set of information from said first central communications facility to said remote facility;

further comprising means for downloading software from the central communications facility to the computerized remote facility.

Claim 5 has three general elements including a first CCCF, a communication device and the disputed means for downloading. The skilled artisan would view claim 5 with respect to the embodiment of figure 1 and find readily apparent correlations: the central facility 12 aligns with the claimed CCCF; the modem 30 aligns with the claimed communications device; and, the modems 16 and 30 along with link 42 align with the claimed means for downloading.



**Fig. 1**

In view of figure 1 and the recited function of "downloading software from the central communications facility to the computerized remote facility," the Court finds that a skilled artisan would link the function at least with modems 16 and 30 along with link 42. In addition to viewing figure 1, however, the skilled artisan would examine the remainder of the intrinsic record to determine other structures that are both clearly linked and necessary to the claimed function. In examining the '044 patent for corresponding structure, the Court finds the following excerpt relevant:

> Input means located at the customer computerized communications facility and application software located at the central computerized communications facility

enable either type of customer to download from the central computerized communication facility to the customer computerized communications facility information, for instance prices and contracts, desired by the customer.

('044, at 4:33-38.)

On its face, this specification excerpt provides a connection between the downloading function and both the "input means" at the CRF and software at the CCCF. However, since the claimed function does not include a user request or anything similar, the Court finds that the "input means" is unnecessary to the function and therefore inappropriate as structural support. *Micro Chem., Inc. at* 1257-58.

Moving further in the intrinsic record, Defendants persuasively cite to the file history, where the Examiner rejected a series of claims under section 112's written description requirement:

> Claims 39-41, 58, 61-63 and 73-76 are rejected under 35 U.S.C. 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention. ***The specification fails to disclose how software is downloaded to from the central communications facility to the computerized remote facility.*** The only description in the specification is that the software is downloaded but there is no discussion as to how this is accomplished. Therefore, the limitation will not be considered by the Examiner.

(Office Action, Aug. 27, 2001 at 4, emphasis added.)

In response to the Examiner's challenge, and speaking in defense of all the rejected claims, Applicant stated the following:

> Claims 39-41, 58, 61-63 and 73-76 stand rejected as allegedly unpatentable pursuant to 35 U.S.C. § 112, first paragraph. In particular, the Office Action alleges that "the specification fails to disclose how software is downloaded [] from the central communications facility to the computerized remote facility."
> Applicant respectfully disagrees.

This is disclosed throughout the specification, for example, at page 9, lines 13-18, it is disclosed:

Input means located at the customer computerized communications facility and application software located at the central computerized communications facility enable either type of customer to download from the central computerized communications facility to the customer computerized communications facility information, for instance prices and contracts, desired by the customer.

Accordingly, Applicant submits that the specification adequately supports the claims. ***As to the Examiner's inquiry about how the software is downloaded, Applicant respectfully submits that at the time of the invention an ordinary skilled artisan would have known several ways to accomplish downloading software.***

(Applicant's Response to Office Action of Aug. 27, 2001 at 17 – 18, emphasis added.)

These file history portions show the '044 patent Applicant encountered with a question regarding whether the specification discloses downloading software. In response, the Applicant made two arguments. First, Applicant quotes the same portion of the specification cited above (col. 4 at lns. 33-38), indicating that input means and application software enable downloading. The Court has already analyzed these statements and determined that they link software with the claimed downloading function. The '044 Applicant's second responsive argument points out that skilled artisans would know "several ways to accomplish downloading." The Court agrees with the Applicant because downloading is a function that can be achieved by any general purpose computer without any special programming. See *Ergo Licensing, LLC v. CareFusion 303, Inc*., 673 F.3d 1361, 1364-1365 (Fed. Cir. 2012) ("a general-purpose computer is sufficient [disclosure for functions] which any general-purpose computer may do without any special programming.").

The Court holds that the structure necessary and clearly linked to the function "downloading software from the central communications facility to the computerized remote facility," is modems 16 and 30, link 42 and software (and equivalents thereof). Since the structure includes a combination of hardware and software, the Court does not analyze the issue

as software per se, and no algorithm is required.[3]  Furthermore, even if the supporting structure

were solely software, the law would similarly require no algorithm.  The Federal Circuit has

explained that algorithms are unnecessary where the claimed function may be performed by any

general-purpose computer:

> *In re Katz Interactive Call Processing Patent Litigation* identified a
> narrow exception to the requirement that an algorithm must be disclosed for a
> general-purpose computer to satisfy the disclosure requirement: when the function
> "can be achieved by any general purpose computer without special
> programming." 639 F.3d 1303, 1316 (Fed. Cir. 2011). In *In re Katz*, we held that
> "[a]bsent a possible narrower construction" of the terms "processing," "receiving,"
> and "storing," the disclosure of a general-purpose computer was sufficient. *Id.* We
> explained that "[i]n substance, claiming 'means for processing,' 'receiving,' and
> 'storing' may simply claim a general purpose computer, although in means-plus-
> function terms." *Id.* at 1316 n.11. In other words, a general-purpose computer is
> sufficient structure if the function of a term such as "means for processing"
> requires no more than merely "processing," which any general-purpose computer
> may do without any special programming. *Id.* at 1316-17. If special programming
> is required for a general-purpose computer to perform the corresponding claimed
> function, then the default rule requiring disclosure of an algorithm applies. It is
> only in the rare circumstances where any general-purpose computer without any
> special programming can perform the function that an algorithm need not be
> disclosed.

*Id.*

The Court finds that the function of downloading software may be performed by any

general-purpose computer, thus obviating any algorithm requirement for the disputed term.

---

[3] *See* Manual of Patent Examining Procedure, Section 2181 at II B (emphasis added).
***Often the supporting disclosure for a computer-implemented invention discusses the implementation of
the functionality of the invention through hardware, software, or a combination of both.*** In this
situation, a question can arise as to which mode of implementation supports the means-plus-function
limitation. The language of 35 U.S.C. 112, sixth paragraph requires that the recited "means" for
performing the specified function shall be construed to cover the corresponding "structure or material"
described in the specification and equivalents thereof. Therefore, by choosing to use a means-plus-
function limitation and invoke 35 U.S.C. 112, sixth paragraph, applicant limits that claim limitation to the
disclosed structure, i.e., implementation by hardware or the combination of hardware and software, and
equivalents thereof. ***Therefore, the examiner should not construe the limitation as covering pure
software implementation.***

**CONCLUSION**

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**So ORDERED and SIGNED this 9th day of May, 2013.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE